NO. 94-429

IN THE SUPREME COURT OF THE STATE OF MONTANA

1995

IN RE THE MARRIAGE OF

MELODY E. CONKEY, f/k/a
MELODY E. PAUNOVICH,

      Petitioner and Respondent,

  and

RAYMOND M. PAUNOVICH,

      Respondent and Appellant.

FILED

MAR 07 1995

*Ed Smith*

CLERK OF SUPREME COURT
STATE OF MONTANA

APPEAL FROM:    District Court of the Eighteenth Judicial District,
                 In and for the County of Gallatin,
                 The Honorable Larry W. Moran, Judge presiding.

COUNSEL OF RECORD:

      For Appellant:

           Todd R. Hillier, Schraudner & Hillier,
           Bozeman, Montana

      For Respondent:

           Lynda S. Weaver, Morrow, Sedivy & Bennett,
           Bozeman, Montana

Submitted on Briefs:  December 22, 1994

Decided:  March 7, 1995

Filed:

_____
           Clerk

Justice William E. Hunt, Sr., delivered the opinion of the Court.

Raymond Paunovich moved the Eighteenth Judicial District court, Gallatin County, to modify his child support obligation. The District Court denied his motion and awarded Melody Conkey, formerly known as Melody Paunovich, attorney fees and costs. Raymond appeals. We affirm and remand for determination of attorney fees and costs.

We frame the issues on appeal as follows:

1. Did the District Court abuse its discretion by not modifying Raymond's child support obligation?

2. Was the District Court's award of attorney fees and costs to Melody supported by substantial evidence?

Melody and Raymond were married on October 4, 1976. Two children were born of the marriage. Melody petitioned for dissolution of the marriage on April 8, 1991. Following trial, the District Court issued findings of fact and conclusions of law on January 17, 1992, which Melody moved to amend. Melody asserted, along with other issues that are not before this Court, that the January 17 findings and conclusions did not provide for child support. The District Court conducted a hearing on the motion on January 29, and on February 5, the District Court entered an order voiding its January 17 findings and conclusions. The court issued revised findings and conclusions on February 20, and its final decree on February 24.

The February 20 findings and conclusions required the parties to file child support determination worksheets by April 1, 1992.

2

On November 4, 1992, the District Court ordered Raymond to pay Melody child support in the amount of $276.62 per month, retroactive to April 1, 1992.

Raymond made child support payments until April 1993. On June 30, 1993, he filed combined motions to modify child support, clarify the final decree, and allow the transfer of property to satisfy the judgment pertaining to the division of the marital estate. In his supporting affidavit, Raymond stated

> [t]hat substantial and continuing changes have occurred in [his] financial and employment status since the court order determining child support was issued . . . which directly affect [his] ability to pay the amount of support so ordered and/or to make any more payments on the property distribution amount decreed by the court back in February of 1992.

Melody filed a motion for contempt against Raymond on September 2, 1993, on the grounds that he had failed to pay child support and court-ordered monthly property distribution payments since April 1993. The District Court issued an order to Raymond to appear and show cause why he should not be held in contempt. On October 21, 1993, the show cause hearing took place. Raymond's attorney stated that Raymond had filed for bankruptcy, and the court stated that it would reset the hearing at a later date.

The parties conducted extensive discovery, and the hearing on Raymond's motion to modify child support was held on January 5, 1994. Following the hearing, both parties submitted proposed findings and conclusions. On May 26, 1994, the District Court issued findings and conclusions denying Raymond's motion to modify child support and ordering him to pay all arrearages. The court

3

further determined that Raymond should pay Melody's attorney fees and costs, and stated that a hearing on the matter would be held at a later date.

A hearing to determine attorney fees and costs was held on June 20, 1994. The District Court received testimony concerning Melody's attorney fees and costs. The court entered judgment on June 20, 1994, awarding Melody $3805.66 for past-due child support and interest, $229.90 for costs, and $2882.50 for attorney fees. Notice of entry of judgment was filed on June 27. Raymond filed notice of appeal on July 22.

Raymond and Melody each filed briefs in this Court. On November 22, 1994, Raymond moved this Court to strike "any and all references contained in Respondent's Answer Brief . . pertaining to matters outside the record and which occurred subsequent to the date of the trial (January 5, 1994) from which this appeal is taken." Raymond specifically complains that Appendix G of Melody's brief on appeal and references to the bankruptcy court proceedings should be stricken. An examination of the record shows that the documents and references which Raymond objects to are part of the record on appeal. Therefore, his motion to strike is denied.

## ISSUE 1

Did the District Court abuse its discretion by not modifying Raymond's child support obligation?

Raymond argues that, because he filed bankruptcy, allegedly has no assets, and allegedly is unemployed, the District Court should have modified his child support obligation. Before a child

4

support obligation can be modified, § 40-4-208(2)(b), MCA, requires the moving party to establish that there are changed circumstances so substantial and continuing as to make the terms of the existing child support agreement unconscionable. In re Marriage of Clyatt (Mont. 1994), 882 P.2d 503, 505, 51 St. Rep. 997, 998; In re Marriage of Craib & Rhodes (Mont. 1994), 880 P.2d 1379, 1384, 51 St. Rep. 937, 940.

In reviewing the district court's findings in child support modification cases, a presumption exists in favor of the district court's decision, and we will overturn the decision only if the district court abused its discretion. Craib & Rhodes, 880 P.2d at 1384; In re Marriage of Platt (Mont. 1994), 881 P.2d 634, 635, 51 St. Rep. 926, 927; Clyatt, 882 P.2d at 505; In re Marriage of Long (Mont. 1994), 885 P.2d 533, 534, 51 St. Rep. 1252, 1253.

In this case, the District Court found that:

> The evidence is insufficient to establish changed circumstances warranting modification of child support as [Raymond] has requested. [Raymond] testified that his circumstances are essentially the same as at the time of dissolution, i.e., his work situation varies in that there are times when he is under contract earning a substantial income, and there are times when he is not earning income because he is soliciting new proposals for production. This Court determined in the dissolution action that Mr. Paunovich is capable of earning substantial income and he remains capable of earning substantial income at the present time.

During the January 5, 1994, hearing, Raymond testified that he stopped making child support payments after April 1993 because he had sold the parties' house, was unemployed, and had "a lot of debts" to pay. After selling the house, he paid off a $24,000 note

5

held by the Stock Grower's State Bank and over $21,000 in credit card bills. He testified that he chose to pay off these debts and not his debts to Melody, and that after doing so, he "didn't have any future work available or lined up" from which to make child support payments. Additionally, he stated that he incurred monthly expenses of about $6768.46

Raymond testified that he was unemployed from October 1991 until February 1992. In February 1992, he entered into a contract with Busch Productions to make a film about bears. The contract provided that "Ray Paunovich, d/b/a The Natural Image Films" would receive $6500 per month. Raymond stated that Busch Productions did in fact pay him and his **film** company $6500 a month.

Raymond testified on cross-examination that he never contacted the court to amend his child support guideline worksheets, which were submitted in 1991 when he was unemployed, to reflect his employment with Busch Productions in 1992. The following exchange took place during the hearing:

[BY MELODY'S ATTORNEY]
Q. And at no time after [February 1992] until today have you informed the Court that you had obtained that contract; isn't that correct?

A. That's correct.

Q. And in fact, you filed several affidavits with this Court, the first of which was filed on behalf of yourself on November 2, 1992 . . . do you recall that?

A. Correct.

Q. And in your affidavit, you stated that "The evidence does not indicate that I earn $54,000 per year; rather the evidence indicates that I earn $18,000 per year." Do you recallstatingthat andsigningthat in your affidavit?

A.    Correct.

.  .  .  .

Q.    And you did not at that time disclose to the Court you had current income at a much higher level, did you?

A.    Was I supposed to?

Q.    I'm asking the question.  Did you disclose it?

A.    I did not.

Raymond testified that his actual income during 1992 was about $31,000, consisting of $18,150 in wages and an additional amount of $13,000. He claimed that his contract with Busch Productions ended in late fall 1992 and that in January 1993 he sold his equipment to Busch Productions for $28,000.  Melody disputed both of these claims.

Both attorneys questioned Raymond regarding his contract with Busch Productions.  In response to his attorney's question whether he was earning any money in 1993, Raymond stated, "I have been unemployed all year."  On cross-examination, however, he testified that, in conjunction with Busch Productions, he continued to work on the project and attempted to develop alternative sources of financing for the film.  Melody's attorney introduced evidence which showed that from May to August 1993, Raymond processed and/or workprinted approximately 7600 feet of film on behalf of Busch Productions.  Raymond testified that he obtained the film from Busch Productions and that he used the camera equipment and editing table which he allegedly sold to Busch Productions.  According to Raymond, Busch Productions did not "want to spend any more money or

7

put up any more of the budget to finish the project," however, "if there were certain expenses that were attributable to this, [Busch Productions] would reimburse me for those costs and we would work together on trying to get the financing."

Melody's attorney also introduced into evidence Raymond's bank account statements from 1993 which showed deposits as follows:

| Month | First Citizens | Western Federal Acct. 1/Acct. 2 | | Total Deposits |
|---|---|---|---|---|
| January | $5094 | $ 3700 | $ 0 | $ 8794 |
| February | 6231 | 2720 | 85 | 9036 |
| March | 6000 | 6940 | 85 | 13,025 |
| April | 7050 | 62,456 | 170 | 69,676 |
| May | 2000 | 7834 | 10,000 | 19,834 |
| June | 3500 | 3744 | 85 | 7329 |
| July | 0 | 2769 | 85 | 2854 |
| August | 827 | 3900 | 0 | 4727 |
| TOTAL | $30,702 | $94,063 | $10,510 | $135,275 |

Only $62,000 of Raymond's total deposits was attributable to the sale of the parties' house.

Melody's attorney also questioned Raymond regarding the alleged sale of his equipment to Busch Productions. According to Raymond, Busch Productions "took possession of [the equipment] when they bought it." However, when Melody's attorney asked during the hearing whether Busch Productions currently had physical possession of the equipment, Raymond stated that he still had physical possession of some it. Raymond also testified that during 1993, he used the equipment for filming and editing. When asked whether he got a release of his financing statement from the Stock Grower's State Bank, to whom the equipment had been pledged as collateral on a note, Raymond stated that he could not recall, and then he stated

8

that he did not communicate with Stock Grower's at all regarding the sale of the equipment. Melody's attorney asked Raymond whether a bill of sale or acknowledgment of receipt was ever executed by a representative of Busch Productions. Raymond stated that he could not recall.

Melody's attorney asked Raymond if he anticipated eventually getting his money back and making a profit on the bear film project. Raymond answered:

A.    I will not get my money back, but I hope that we will get the financing so I can at least get employed again. That's part of being an independent producer, is you have to risk a lot of capital to get income.

Q.    You anticipate getting that back?

A.    I always anticipate that. $M_Y$ whole life is anticipation. Nothing that is being an independent producer is guaranteed. Everything that you do is done on anticipation. You hope somebody likes your concept and idea and will finance it.

Q.    That was true in 1992; isn't that true?

A.    This has been true ever since I have been working.

Q.    It hasn't changed a bit since you testified in trial in 1992?

A.    What hasn't changed?

Q.    The fact that there are highs and lows in your industry and sometimes you have highs and sometimes you have zero.

A.    That's correct.

Based on the foregoing testimony and evidence, it is clear that Raymond failed to demonstrate a change in circumstances so substantial and continuing to make the terms of the existing child support agreement unconscionable. We determine that the District

9

Court did not abuse its discretion by refusing to modify Raymond's child support obligation.

## ISSUE 2

Was the District Court's award of attorney fees and costs to Melody supported by substantial evidence?

Section 40-4-110, MCA, provides district courts with the discretion to award attorney fees and costs in certain domestic relation matters. In re Marriage of Malquist (Mont. 1994), 880 P.2d 1357, 1361, 51 St. Rep. 914, 917. That statute provides:

> The court from time to time, after considering the financial resources of both parties, may order a party to pay a reasonable amount for the cost to the other party of maintaining or defending any proceeding under chapters 1 and 4 of this title and for attorney's fees, including sums for legal services rendered and costs incurred prior to the commencement of the proceeding or after entry of judgment. The court may order that the amount be paid directly to the attorney, who may enforce the order in his name.

Section 40-4-110, MCA.

In **Malquist**, we held that

> before a court awards attorney fees under the statute, the petitioning party must make a showing of necessity. In addition, the award must be reasonable and must be based on competent evidence. To make a showing of reasonableness a hearing must be held allowing for oral testimony, the introduction of exhibits, and the opportunity to cross-examine. If the award of attorney fees is supported by substantial evidence, we will not reverse the award upon appeal.

Malauist, 880 P.2d at 1362 (citations omitted).

In the instant case, Melody's attorney filed affidavits of attorney fees on June 2, 1994, and June 15, 1994, and a hearing was held on June 20, 1994. Counsel for both parties were present at

10

the hearing. Melody's attorney moved for entry of judgment for back child support and attorney fees. The record shows that Raymond's attorney stated that he had no objection to the motion. The District Court, therefore, entered judgment.

The requirements set forth in <u>Malquist</u> clearly were met in this case. The record contains substantial evidence supporting the District Court's award of attorney fees to Melody.

Melody further requests that this Court award her attorney fees and costs for defending this appeal. Section 40-4-110, MCA, allows the recovery of attorney fees incurred after entry of judgment by the district court, including attorney fees incurred in defending an appeal. We, therefore, award the respondent her attorney fees and costs on appeal and remand to the District Court for determination of the amount to be awarded.

Affirmed and remanded.

_____
Justice

We concur:

_____
Chief Justice

_____

_____

_____
Justices

11